**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

**Leganzie S. Kale**                                                                                        **Plaintiff**

v.                        **CASE NO. 3:14CV00067 JTK**

**Carolyn W. Colvin, Acting Commissioner,**
**Social Security Administration**                                                       **Defendant**

**ORDER AFFIRMING THE COMMISSIONER**

Leganzie S. Kale seeks judicial review of the denial of his application for disability insurance benefits (DIB). Kale applied for DIB in June 2011, with an alleged onset date of December 17, 2010.[1] This is Kale's second application for DIB. His previous application was denied on July 13, 2004.[2] Kale last worked in December 2010 as an assistant program director at a radio station.[3] Kale's date last insured is December 31, 2015.[4] Kale bases disability on bi-polar disorder, attention deficit hyperactivity disorder (ADHD), anxiety, panic attacks, depression, cardiac dysrhythmia and hypothyroidism.[5]

**The Commissioner's decision.** The Commissioner's ALJ determined that Kale has not engage in substantial gainful activity since the alleged onset date.[6] Kale has severe impairments - bipolar disorder with depression, ADHD, generalized anxiety disorder with panic attacks and

---

[1] SSA record at p. 106.

[2] *Id.* at pp. 125-126.

[3] *Id.* at p. 131.

[4] *Id.* at p. 125.

[5] *Id.* at pp. 130 & 206.

[6] *Id.* at p. 12.

cardiac dysrhythmia.[7] None of Kale's severe impairments meet the Listings, and Kale can perform a full range of work at all exertional levels, but he is restricted to simple, unskilled and semiskilled work activities, jobs that a high school graduate can perform; he can understand, follow and remember concrete instructions; contact with supervisors, coworkers and the public is superficial; and he can meet, greet, make change and follow simple instructions and directions.[8] The ALJ held that Kale cannot perform any past relevant work,[9] but can perform the positions of document preparer and jewelry preparer, positions identified by the vocational expert (VE) as available in the state and national economies.[10] Kale's application was denied.[11]

After the Commissioner's Appeals Council denied a request for review, the ALJ's decision became a final decision for judicial review.[12] Kale filed this case to challenge the decision. In reviewing the decision, the Court must determine whether substantial evidence supports the decision and whether the ALJ made a legal error.[13]

---

[7]*Id.*

[8]*Id.* at pp. 13 & 15.

[9]*Id.* at p. 23.

[10]*Id.* at pp. 24-25.

[11]*Id.* at p. 25.

[12]*See Anderson v. Sullivan*, 959 F.2d 690, 692 (8th Cir. 1992) (stating, "the Social Security Act precludes general federal subject matter jurisdiction until administrative remedies have been exhausted" and explaining that the appeal procedure permits claimants to appeal only final decisions).

[13]*See* 42 U.S.C. § 405(g) (requiring the district court to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner conformed with applicable regulations); *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) ("We will uphold the Commissioner's decision to deny any applicant disability benefits if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support

**Kale's allegations.** Kale maintains that the ALJ's denial of disability benefits should be reversed because the ALJ erred in the RFC determination. The ALJ's decision is supported by substantial evidence and no legal error occurred.

Substantial evidence is "less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion."[14] For substantial evidence to exist in this case, a reasonable mind must accept the evidence as adequate to support the determination that Kale is not disabled.[15]

**RFC.** Kale argues that an error occurred in the RFC determination because the opinion of the treating psychologist was not given controlling weight. Although the opinion of a treating physician is usually granted controlling weight, "an ALJ may grant less weight . . . when that opinion conflicts with other substantial medical evidence contained within the record."[16] In the instant case, the ALJ determined that the opinion of Kale's treating psychologist was not conclusive as to the issue of disability because it was highly inconsistent with the medical evidence and other evidence of record. This determination is supported by substantial evidence.

Kale's treating psychologist completed a Medical Source Statement in February 2013.[17] She opined that Kale is markedly limited in his abilities to sustain an ordinary routine without

---

the conclusion that the claimant was not disabled.").

[14] *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010) (internal quotations and citations omitted).

[15] *See Britton v. Sullivan*, 908 F.2d 328, 330 (8th Cir. 1990).

[16] *Prosch v. Apfel*, 201 F.3d 1010, 1013-14 (8th Cir. 2000).

[17] SSA record at p. 296.

special supervision and respond appropriately to changes in the work setting.[18] She further determined that he is extremely limited in the:

> ability to carry out detailed instructions;
>
> ability to maintain attention and concentration for extended periods;
>
> ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
>
> ability to work in coordination with or proximity to others without being distracted by them;
>
> ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
>
> ability to interact appropriately with the general public;
>
> ability to accept instructions and respond appropriately to criticism from supervisors; and
>
> ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.[19]

As the ALJ determined, this opinion is inconsistent with substantial records presented in this case.

While the record reflects that Kale has sought mental health treatment for bipolar disorder, anxiety and ADHD in the past, the record establishes that with treatment, Kale's mental impairments improved. In late 2008 through 2009, Kale sought treatment with his current treating psychologist. Through multiple counseling sessions, Kale was taught coping mechanisms, how to challenge negative self thoughts, and how to identify anger triggers, among

---

[18]*Id.* at pp. 296-297.

[19]*Id.*

other things.[20] Kale's treating psychologist referred Kale to a psychiatrist for prescription medications.[21] Kale was subsequently prescribed medications for ADHD, bipolar and anxiety.[22] These medications remain relatively consistent throughout the medical records. Although one progress note during this time period indicates that Kale's mental progress deteriorated,[23] the remainder of the notes observe improvement or no change.[24] Indeed, in letters to Arkansas State University - where Kale was previously enrolled - and to the principal of Coahoma County High School - where Kale was employed - the treating psychologist noted *significant improvement* in Kale.[25] Kale does not seek additional treatment or counseling for approximately sixteen months following these sessions.

In January 2011, subsequent to the alleged onset date, Kale returned to his treating psychologist.[26] The note indicates that Kale's progress had deteriorated.[27] The treating psychologist refers Kale to his primary care physician for prescription of a mood stabilizer.[28]

---

[20]*Id.* at pp. 322-323, 326-329, 333, 335, 342, 344-345, 348, 354-355, 361, 371, 393 & 395-397.

[21]*Id.* at p. 360.

[22]*Id.* at pp. 335, 345 & 355.

[23]*Id.* at p. 342.

[24]*Id.* at pp. 322-323, 326-329, 333, 335, 344-345, 348, 354-355, 361, 371, 393 & 395-396.

[25]*Id.* at pp. 346-347.

[26]*Id.* at p. 312.

[27]*Id.*

[28]*Id.* at p. 214.

Kale is prescribed Pristiq.[29] After experiencing side effects, however, he is prescribed a different anti-depressant - Lexapro.[30] In a February 2011 progress note, Kale's treating psychologist observed that Kale had improved.[31] This observation is echoed in progress notes from cardiology and endocrinology appointments in which the physicians observed no depression, no anxiety, no apparent distress, and no suicidal ideation.[32] Kale was awake, alert and oriented in all three spheres.[33] His judgment, mood and affect were appropriate.[34]

Although Kale alleges disabling mental symptamology in 2011 and 2012, following the February 2011 appointment with his treating psychologist, Kale does not seek additional treatment with a mental health professional until February 2013.[35] In February 2013, on the same day the Medical Source Statement was completed, Kale's treating psychologist noted that Kale had shown some slight improvement.[36] He was neither suicidal nor homicidal.[37] Further, no medication changes - aside from additional medications for physical impairments - were noted.[38] Kale was continued on basically the same medications he was prescribed from 2009-2011.

---

[29]*Id.*

[30]*Id.* at p. 213.

[31]*Id.* at p. 299.

[32]*Id.* at pp. 232 & 263.

[33]*Id.* at p. 232.

[34]*Id.* at pp. 232 & 263.

[35]*Id.* at p. 298.

[36]*Id.*

[37]*Id.*

[38]*Id.*

The records establish that Kale's mental impairments can be controlled with treatment. This weighs in favor of the ALJ's evaluation of Kale's treating psychologist's opinion.[39] What provides even further support is the fact that Kale sought only episodic treatment.[40] There are long stretches in the medical record during which Kale sought no mental health treatment.[41]

The state physician assessments also conflict with the conclusions of Kale's treating psychologist and therefore provide greater support for the ALJ's determination. In September 2011, a state physician examined Kale and completed a consultative report.[42] During the exam, Kale communicated to the physician that he suffers from depression, bipolar disorder, hyperthyroid disorder, panic attacks and increased heart rate.[43] He denied, however, that he was significantly depressed or experiencing any suicidal ideation at that time.[44] The physician noted

---

[39] *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (holding depression was not severe when it improved with medication); *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) ("An impairment which can be controlled by treatment or medication is not considered disabling.").

[40] *See Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) (failing to seek medical assistance for alleged physical and mental impairments contradicted claimant's allegations of disabling conditions and supported unfavorable decision); *Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (complaints of disabling pain and functional limitations are inconsistent with the failure to take prescription pain medication or to seek regular medical treatment for symptoms).

[41] Kale maintains that he did not seek continuous treatment due to financial constraints. When there is no evidence, however, that he sought to obtain low-cost medical treatment from his treating psychologist or from area clinics or hospitals, or that he was denied medical care due to his financial condition, an ALJ can properly find that a claimant's financial condition was not severe enough to justify his failure to seek treatment. *See Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992).

[42] SSA record at p. 235.

[43] *Id.*

[44] *Id.*

that:

> [Kale] displayed a euthymic tone, and was polite and cooperative throughout the interview. Affect was appropriate to content and without remarkable expansion or constriction of expressive range. . . . Speech was generally unremarkable and without pressure, acceleration or slowing. . . . Throughout the course of the evaluation, speech was logical, relevant and goal directed and without remarkable circumstantiality. . . . [Kale] did not present with any bizarre or peculiar preoccupations and denied experiences of thought withdrawal/insertion or control. No formal delusional material was elicited. . . . During the current evaluation there was no avert evidence of responding to internal stimuli. Hallucinations and delusions were denied. [Kale] presented as alert and fully oriented.[45]

After administering multiple diagnostic tests, the state physician determined that Kale is bipolar and assigned a Global Assessment of Functioning (GAF) score of 65.[46] The report notes that Kale drives familiar routes, can handle personal finances, performs household chores, considers himself typical in terms of social interaction and denies social isolation.[47] The physician opined that Kale "maintains an average level of adaptive functioning . . . appear[s] capable of adequate and socially appropriate communication and interaction" and "appear[s] to sustain a reasonable degree of cognitive efficiency and was able to track and respond to various kinds of questions and tasks."[48] Further, it was noted that Kale has the capacity to perform tasks within a basically acceptable timeframe.[49]

As the state physician made note of in his report, Kale is able to carry out many activities of daily living. According to a Function Report completed by Kale, he is able to tend to his own

---

[45]*Id.* at p. 236.

[46]*Id.* at p. 237.

[47]*Id.*

[48]*Id.* at pp. 237-238.

[49]*Id.* at p. 238.

personal care.[50] He sometimes microwaves food for himself, can load and unload the dishwasher and wash laundry.[51] He is able to go out alone, drive a car and shop in stores.[52] Further, he can pay bills, count change, handle a savings account and use a checkbook/money orders.[53] Kale's spouse reported that Kale leaves the house a couple of times a week.[54] Kale would visit his mother when she was still living and eats lunch out at local restaurants.[55] Kale is able to take the trash out.[56]

It is also important to note that a few months prior to Kale's alleged onset date, he obtained a master's degree.[57] Although this occurred prior to the alleged onset date, it is telling about Kale's mental state. Kale asserts that his grandmother's death in 2008 greatly affected his mental health.[58] Indeed, many of the counseling notes indicate just that.[59] Although the death of a family member is certainly traumatic, the record demonstrates that Kale's masters degree was completed subsequent to his grandmother's death. Pursuing post-graduate education requires

---

[50]*Id.* at p. 169.

[51]*Id.* at p. 170.

[52]*Id.* at p. 171.

[53]*Id.*

[54]*Id.* at p. 156.

[55]*Id.*

[56]*Id.* at p. 154.

[57]*Id.* at p. 37.

[58]*Id.* at pp. 38-39 & 374.

[59]*Id.* at pp. 322-323, 326-329, 333, 335, 342, 344-345, 348, 354-355, 361, 371, 393 & 395-397.

hard work, concentration and persistence. Through his grief, Kale was able to demonstrate each of these qualities as evidenced by his advanced degree. This weighs against the opinion of Kale's treating psychologist.

A reasonable mind would find the above evidence adequate to support the ALJ's decision to decline to give controlling weight to the opinion of Kale's treating psychologist. The treating psychologist's opinion conflicts with the records presented.

**Conclusion.** Substantial evidence supports the ALJ's decision. The ALJ made no legal error. For these reasons, the court DENIES Kale's request for relief (docket entry # 2) and AFFIRMS the Commissioner's decision.

It is so ordered this 23rd day of January, 2015.

_____
UNITED STATES MAGISTRATE JUDGE